UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

UNITED STATES OF AMERICA,      )
                                      )
        Plaintiff,            )         No. 5:15-CR-106-DCR-REW
                                        )
v.                                    )
                                        )      RECOMMENDED DISPOSITION
LISA DAWN CROWE,          )
                                      )
        Defendant.      )

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant, Lisa Dawn Crowe, by counsel, moves to suppress all evidence (and the fruits thereof) seized during law enforcement's June 26, 2015, search of her residence and vehicle. DE #46 (Motion to Suppress). Defendant argues that the affidavit underlying the search warrant contained stale information and failed to establish probable cause. She further asserts that certain omissions justify a hearing under *Franks v. Delaware*, 98 S. Ct. 2674 (1978). The United States responds in opposition, arguing that the affidavit content was not stale and did establish probable cause and that Defendant has not met the *Franks* burden. DE #59 (Response). Defendant replied. DE #62 (Reply).

The Court has reviewed the entire record, including the parties' briefs, the warrant and subject Affidavit, and the applicable law. The matter is ripe for consideration. For the following reasons, the Court **RECOMMENDS** that the District Court **DENY** the motion to suppress (DE #46). Defendant has not justified a *Franks* hearing, and Crowe's attacks on the warrant's basis fail.

1

## I.        BACKGROUND / THE AFFIDAVIT

Robert Maynard, an ATF Special Agent with approximately 11 years of experience, swore to the affidavit at issue before and obtained a search warrant from United States Magistrate Judge Hanly A. Ingram on June 24, 2015. DE ##46-2 (Application and Affidavit); 46-3 (Warrant). The Affidavit targeted oxycodone conspiracy and felon-in-possession evidence[1] at 2210 New Cut Road, Jeffersonville,[2] Montgomery County, Kentucky, and in a white Mercedes with Kentucky license plate number 144 RVT. DE ##46-2, at 1; 46-3, at 1.

The Affidavit generally details law enforcement's investigation into an oxycodone distribution conspiracy in Montgomery County, centered around individuals Lisa Crowe, Scotty Holder, and James Cundiff. On May 8, 2015, Maynard met with Mt. Sterling Police Department (MSPD) Sergeant Jimmy Daniels and Chief David Charles regarding Crowe. DE #46-2, at 3. A cooperating witness (CW) had advised Daniels and Charles that Crowe had been observed possessing firearms at her then residence of 214 Main Street (Mt. Sterling) in early May 2015. *Id.* Crowe and Holder apparently lived there together and shared a bedroom. Maynard stated that the CW's identity "is personally known to [him] as well as the contributing law enforcement agents." *Id.* Maynard advised that Daniels and Charles knew that Crowe is a felon.[3] *Id.* Maynard

---

[1] Notably, the application face lists only § 846 as the offense to which the "search is related[.]" DE #46-2, at 1. SA Maynard, however, avers in the Affidavit that there is probable cause to search for evidence of violations of § 846 and § 922(g)(1). *Id.* at 2-3. Later, the conclusion of Maynard's affidavit mentions only evidence of drug crimes, *id.* at 9, and attachment A particularly mentions only drug crimes, *id.* at 11, although it also includes firearms as a search target. *Id.* at 12. The warrant hinges on attachment A. The Court will assess these issues below.

[2] Attachment B of both the application and warrant list 2210 New Cut Road as being in "Jeffersonville, Lexington, Montgomery County, Kentucky[.]" DE ##46-2, at 13, 46-3, at 5. This seemingly erroneous inclusion of Lexington does not impact warrant validity.

[3] Maynard did not further develop or substantiate Crowe's record. The Court notes that a § 922(g)(1) crime requires a conviction for conduct punishable by a term *exceeding* one year. The reference here used the generic term "felony" but is indeterminate.

surveilled 214 Main Street on May 8, 2015, and observed there a white Mercedes with license plate 144 RVT, which was registered to Crowe.

On May 9, 2015, the CW advised law enforcement that Crowe's source of supply was "in town" and staying at a certain hotel. *Id.* MSPD Det. Haddix located the source's vehicle, a red/maroon Ford F-250, which he determined was registered to Stanford Ray Coleman. *Id.* Maynard soon obtained a copy of Coleman's Georgia driver's license, bearing his photograph, as well as his felony record. *Id.*

On May 29, 2015, Maynard interviewed the CW, who stated that on May 28, he "observed a nickel plated firearm laying on a bedside table" in Crowe's bedroom at 214 Main, "a black in color Glock styled pistol on a floor in the same bedroom, and a large white plastic container on the dresser with several hundred prescription pills inside." *Id.* A man known as "T" was present as well; the CW identified T as Crowe's oxycodone supplier—*i.e.*, Coleman. *Id.* at ¶ 2. The CW saw prescription bottles on the dresser "with the names ripped off of the labels" but that nevertheless "did display oxycodone 30 notations[.]" *Id.* The bottles, like Coleman himself, "were from Georgia[,]" as is T. *Id.* at 3-4. The CW identified T as the person in Coleman's license photograph. *Id.* at 4. The CW related he had earlier conversed with Holder, who advised that Crowe had 6,000 oxycodone pills to sell. *Id.* Holder advised that Crowe provides him with two hundred pill "packs" and provides refills after he sells them. *Id.*

Maynard then avers to a series of individual drug distribution or other related episodes in the May-June period. The Court here summarizes the ones directly implicating Crowe[4]:

1.   May 7, 2015—the CW went to Holder and Crowe's then residence at 214 Main Street and gave Holder $240 for 6 oxycodone pills inside the home.

---

[4] The summary comes from ¶¶ 6-21 of the Affidavit.

2.  May 13, 2015—the CW went to 214 Main Street and gave Cundiff $160 for 3 packages of heroin inside the residence. Authorities confirmed the heroin by field test.

3.  May 15, 2015—the CW contacted Holder about purchasing oxycodone and set a meeting at 214 Main Street. Holder then changed the meeting to the Mt. Sterling Dairy Queen. Law enforcement observed Crowe's white Mercedes parked at Dairy Queen, and Daniels and Charles recognized Crowe as the driver. The CW approached the passenger side of the Mercedes, where Holder sat, and gave Holder $200 for 5 oxycodone pills.

4.  June 2, 2015—the CW and an undercover law enforcement officer (the UC) went to 214 Main Street to purchase oxycodone. The UC observed Crowe in the bathroom (and Cundiff later emerged from the same room). The UC gave Holder $1,900 for 50 oxycodone pills; Holder said that $1,750 of the price belonged to "Lisa," *i.e.*, Crowe. Agents saw Crowe's Mercedes outside the residence and observed Crowe leave the residence afterward. They followed her to a residence on New Cut Road. Two homes there share a common gravel driveway. Crowe parked at the first residence—2210 New Cut Road.

5.  June 9, 2015—the CW and UC purchased 50 oxycodone pills for $1,900 from Holder at a Marathon Gas Station in Mt. Sterling. Holder advised, using pronouns, that Crowe sells him and resupplies him with oxycodone. Holder advised that the UC could sit down with "her" and talk business. Holder bragged about the scope of the business.

6.  June 9, 2015 [presumably, in context, the Affidavit's reference to 2014 is incorrect]—Maynard and Agents observed Crowe's Mercedes and Coleman's truck at 214 Main Street. Agents (it is not clear who; the Affidavit uses passive language) followed Coleman's truck to 2210 New Cut Road, and later, the Mercedes "headed into the specific vicinity of 2210 New Cut Road." Law enforcement later observed a white vehicle parked at the residence.

7.  June 9, 2015—the CW advised that he was at 214 Main Street with Crowe, Holder, T, and an individual known as "Black." The CW observed T (*i.e.*, Coleman) in the F-250. Crowe told the CW "that they were moving residences."

8.  June 10, 2015—Holder told the CW that Crowe went to Detroit to pick up 5,000 – 10,000 oxycodone pills.

9.  June 10, 2015—Maynard showed the CW a photograph of Coleman, who positively identified Coleman as T, Crowe's oxycodone supplier. Additionally, the UC positively identified photographs of Crowe, Holder, and Cundiff as individuals who distributed oxycodone, all as detailed in the Affidavit.

10. June 12, 2015—the CW and UC arranged an oxycodone buy from Holder and Crowe at the Dairy Queen. The buyers wanted 100 pills, but Crowe advised she did not have 100 and would go "to the house" to get them. Crowe said the trip "to the house" would take 45 minutes. Maynard knew that 45 minutes is approximately the time it would take to go to and from the Dairy Queen to 2210 New Cut Road, not the much closer 214 Main Street. Maynard thus believed that

Crowe referred to her "house" as 2210 New Cut Road. Regardless, Crowe later and directly "sold the UC twenty (20) doses of Oxycodone[.]"

11.   June 16, 2015—the UC purchased 100 doses of oxycodone from Crowe for $3,500 at the Downtown Athletic Center in Mt. Sterling.

12.   June 17, 2015, at 5:00 a.m.—Charles and Daniels observed Crowe's Mercedes parked at 2210 New Cut Road.

During each drug transaction the Affidavit depicts, the CW "was equipped with audio and or video tape recording devices." *Id.* at 8. Maynard reviewed and corroborated the Affidavit text by all recordings. Maynard averred, based on experience and training, that "the suspected Oxycodone pills purchased in each of the transactions listed above are in fact Oxycodone, a Schedule II controlled substance." *Id.* at 7. Maynard noted that Clark Energy Cooperative, the electric company that services the Jeffersonville area, advised him that on or about May 22, 2015, Crowe initiated electric service in her own name at 2210 New Cut Road, using the same telephone number as Crowe provided to the UC. *Id.* at 8. Maynard averred that, at the time of warrant issuance, there was a reasonable basis to believe that 2210 New Cut Road was Crowe's current residence. *Id.* at 9.[5]

Based on the Affidavit, Judge Ingram found probable cause and issued the search warrant on June 24, 2015. Defendant now challenges the Affidavit's sufficiency, seeking a hearing and suppression of search results and related search fruits.

---

[5] The Court also notes a series of other transactions between the CW and Cundiff. *See, e.g.*, DE #46-2 at ¶¶ 5, 22. The narrative in this decision does not detail all of those, but the Affidavit established that Cundiff regularly dealt OC to the CW and also regularly appeared in the Crowe circle under incriminating circumstances.

## II.    DEFENDANT HAS NOT JUSTIFIED A *FRANKS* HEARING.

"[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 98 S. Ct. at 2676. Further, "a search warrant is invalid when the supporting affidavit contains a statement, necessary to the finding of probable cause, that is later demonstrated to be false and included by an affiant knowingly and intentionally, or with a reckless disregard for the truth." *United States v. Duval*, 742 F.3d 246, 250 (6th Cir. 2014) (citing *Franks*, 98 S. Ct. at 2676). A "defendant who challenges the veracity of statements made in an affidavit that formed the basis for a warrant has a heavy burden." *United States v. Green*, 572 F. App'x 438, 441 (6th Cir. 2014) (internal quotation marks and citation omitted). "[P]robable cause may be founded upon . . . information received from informants[.]" *Franks*, 98 S. Ct. at 2681.

A warrant normally rises or falls only based on information within the four corners of the pertinent application. *See United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). The Supreme Court clearly set the standard for going beyond the four corners in the *Franks* context:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is

set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks*, 98 S. Ct. at 2684.

Here, Defendant argues, "There are material omissions from the affidavit that warrant an evidentiary hearing under" *Franks*. DE #46, at 2. The Government responds that "there were no omissions that would have affected the Magistrate's determination of probable cause" and "Defendant has not met her heavy burden of production to be entitled to a *Franks* hearing." DE #59, at 2; *see also id.* at 12-13.

*Franks* makes no particular mention of affidavit *omissions*. However, "material omissions are not immune from inquiry under *Franks*, . . . [but] an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997). "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. If the defendant does succeed in making a preliminary showing that the government affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit, the court must then consider the affidavit including the omitted portions and determine whether probable cause still exists." *Id.* (internal citation and quotation marks omitted); *see also United States v. Merrell*, 330 F. App'x 556, 560 (6th Cir. 2009); *United States v. Fowler*, 535 F.3d 408, 415-16 (6th Cir. 2008) ("This court has repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement.").

8

Applying these principles, Defendant has not justified a *Franks* hearing. She has not made a substantial preliminary showing that Maynard knowingly and intentionally, or with reckless disregard for the truth, included a false statement in or omitted material information from the Affidavit. Crowe's particular argument as to hearing justification is that Maynard omitted information (1) concerning the CW's drug use; (2) as to ¶ 16, that Crowe had other errands to run on the trip "to the house"; and (3) that Maynard knew Holder to be unreliable.

The argument clearly fails on several fronts. First, and most fundamentally, Defendant offers no proof that the CW actually used drugs, that Crowe actually had or claimed to have errands to run, or concerning Maynard's posture on Holder's reliability. Defendant offers only conclusory briefing statements, which, per *Franks*, is inadequate to carry the hearing burden. 98 S. Ct. at 2684 (The "allegations must be accompanied by an offer of proof[.]"). Crowe puts nothing confirmatory into the record on these allegations. Second, even assuming that the CW did use drugs, that Crowe did have errands to run, and / or that Maynard did know Holder to be unreliable, Crowe offers no proof—only briefing statements—that Maynard (1) knew the information concerning drug use and errands[6] and (2) as to all three categories, omitted the information from the Affidavit with the requisite bad intent—that is, that Maynard misled Judge Ingram knowingly and intentionally, or with reckless disregard for the truth. Crowe offers nothing that speaks to Maynard's awareness or intent.

Further, even if Defendant jumped the intent hurdle, the three complained-about omissions would not have changed Judge Ingram's probable cause determination. The

---

[6] In the reply, Crowe represents her video-recorded statement regarding, as part of the trip home, "get[ting] air in the air tank," DE #62, at 4-5, which, per Maynard's statement in the Affidavit, he reviewed. Still, Crowe did not include the videotape, a transcript, an affidavit, or any other proof to substantiate the claim.

9

Affidavit's plenteous facts showing Crowe to be an active oxycodone trafficker equate to probable cause, for the reasons discussed at length below, even if Judge Ingram knew that the CW used drugs, that errands may justify the ¶ 16 timeframe as to the in-town address, and that Holder was generally unreliable.

The Affidavit shows the CW to be an individual involved in the Montgomery County oxycodone scene and making consistent pill purchases. Maynard may not have vouched for the CW, but most of the CW's story had objective cross-corroboration. In the context where the CW audio- or video-recorded every transaction, and Maynard reviewed each in preparing the Affidavit, concerns over the CW's credibility considerably shrink. The UC's consistent involvement further buttresses the Affidavit, along with other agents' direct observations and investigation. Thus, including a statement that the CW used drugs would not have changed Judge Ingram's finding. The warrant did not rest on the uncorroborated musings of a drug user.

Next, fully excising any mention of timing from ¶ 16 makes no ultimate difference in the probable cause determination; that paragraph alone still straightforwardly avers that Crowe "sold the UC twenty (20) doses of Oxycodone[.]" DE #46-2, at 7. Combined with the Affidavit's clear portrait of Crowe as drug trafficker (explained more fully below), and the considerable other evidence directly connecting Crowe to 2210 New Cut as residence, the 45 or 20 minute debate in ¶ 16[7] was not material to Judge Ingram's finding.

Finally, Holder's individual credibility was hardly central to Judge Ingram when he made the probable cause finding. The Affidavit shows Holder to be an oxycodone distributor. Again, as with the CW, the Affidavit did not rest on unsubstantiated Holder statements; law enforcement recorded each oxycodone transaction, and subsequent events substantiate significant

---

[7] At most, the errands issue is a timing ambiguity.

parts of Holder's various statements during the investigation. For instance, as the Affidavit shows, Crowe returned to the oxycodone trade on June 12, two days after Holder said that she went to Detroit to buy several thousand pills (and after a few days of inactivity). Of course, the Affidavit (submitted on June 24) predates the Holder interview Crowe cites. Nonetheless, the Affidavit itself relies on very little Holder said that objective evidence (confirmatory audio/video and UC presence) did not corroborate. Whether or not Holder puffed the size of his (or Crowe's) operation, the objective proof established that Crowe herself supplied, agreed to, or negotiated the sale of hundreds of OC pills (per May 15, June 2, June 9, June 12, and June 16 circumstances) to the CW or UC in the May-June window, including a 100 pill transaction within 10 days of the search, and mere days after an alleged Detroit supply run. Any scope exaggerations by Holder, whether suspected or not, had no material impact on probable cause as to Crowe and her residence.[8]

*Franks*, applied in the omissions context through *Atkin* and *Fowler*, erects a high burden to a defendant seeking to challenge an affidavit, and Defendant simply has not surmounted it—in any of the sequential analytical steps—here. The requirements are all the more potent—the already high bar is yet "higher," as *Atkin* and *Fowler* express—in this context, and the Court finds Crowe's showing to undershoot the mark. Defendant has not met the burden to justify a *Franks* hearing or attendant relief.

---

[8] Crowe devotes her reply, DE #62, to pointing out possible Holder statement inconsistencies and that he may have had a supplier other than Crowe. Most of the imputed statements (*e.g.*, the 500-pill statement in ¶ 3 or the over-$12,000 one-day profit statement in ¶ 12) are simply inapposite to the probable cause finding as to Crowe. As stated, even if Holder may have a general credibility problem, the critical details as to Crowe here are independently corroborated in fact or by reasonable inference. Judge Ingram's probable cause finding did not turn on unverified or unsupported Holder statements.

## III.    THE INFORMATION IN THE AFFIDAVIT WAS NOT STALE.

Defendant argues that the Affidavit contained certain stale information, particularly concerning firearms. DE #46-1, at 2, 5-6. Stale information cannot, at least alone, provide the basis for probable cause. *United States v. Frechette*, 583 F.3d 374, 377-78 (6th Cir. 2009) (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)); *see also Marcillis v. Township of Redford*, 693 F.3d 589, 601 (6th Cir. 2012). This is because the probable cause determination "is concerned with facts relating to a presently existing condition[.]" *Spikes*, 158 F.3d at 923 (internal quotation marks omitted) (quoting W. LaFave, *Search and Seizure* § 3.7 at 338 (3d ed. 1996)).

"The staleness inquiry depends on the inherent nature of the crime." *Frechette*, 583 F.3d at 378 (internal quotations marks omitted). "In the context of drug crimes, information goes stale very quickly because drugs are quickly sold and consumed[,]" but "evidence that criminal activity is of an ongoing nature will defeat claims of staleness." *Marcillis*, 693 F.3d at 601 (internal quotation marks omitted). To evaluate staleness, the Court considers the following: (1) the character of the crime; (2) the criminal; (3) the thing to be seized; and (4) the place to be searched. *Frechette*, 583 F.3d at 378 (citing *United States v. Abboud*, 438 F.3d 554, 572-73 (6th Cir. 2006)). The staleness test does not "create an arbitrary time limitation within which discovered facts must be presented[.]" *Spikes*, 158 F.3d at 923 (quoting *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)). The "critical question is whether the information contained in the affidavit, when presented to the . . . judge, established that there was a fair probability that [particular evidence] would still be found at" the residence. *Id.*

The Court finds that the Affidavit's information concerning firearms was not stale. As Crowe points out, the last temporal mention of a firearm sighting was May 28, 2015. *See* DE #46-2, at 3-4. This is **less than a month** before warrant execution. On May 28, the CW saw a nickel plated firearm and a Glock styled pistol in Crowe's bedroom at 214 Main Street. Ultimately, Judge Ingram authorized a late June search of 2210 New Cut for "[f]irearms (including handguns, rifles, shotguns, semi-automatic and/or automatic weapons)." DE #46-3, at 4.

It is true that the Affidavit draws no explicit connection between firearms and 2210 New Cut and makes no mention of firearms after May 28. For a variety of reasons, however, this does not make the information stale. May 28 is *after* Crowe opened utilities in her own name at 2210 New Cut (which occurred on May 22). T, *i.e.*, Coleman—Crowe's alleged supplier—was present with the firearms on May 28 and made at least one subsequent trip to New Cut, as detailed in the Affidavit. The May 28 information inferentially ties firearms in Crowe's bedroom to her oxycodone distribution, and the Affidavit plainly shows continuing proof of trafficking through June 16, post-move to New Cut. The Court has considered the *Frechette* factors and finds, viewing the situation as a whole, that the evidence here of firearm possession intimately associated with oxycodone distribution less than a month before warrant execution is not stale. Firearms—tools of the drug trade, *see United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001)—are of enduring utility, often persist over time in trafficking activities, are easily transportable, and likely would follow traffickers to a new home or operation center, a situation that probable cause supports here. *See, e.g.*, *United States v. Goodwin*, 552 F. App'x 541, 545-46 (6th Cir. 2014) (upholding warrant validity concerning firearms with 3-month timeline between

last firearm sighting and warrant execution, stating, "because firearms are durable goods and might well be expected to remain in a criminal's possession for a long period of time, the witness's information regarding the firearms was not stale," and commenting that firearms have "enduring utility" to the holder and that owners often keep the guns in their home as a "secure operational base," lessening the concern over a time gap (internal quotation marks and alteration omitted)); *see also United States v. Lancaster*, 145 F. App'x 508, 512-13 (6th Cir. 2005) (same, with a 2-year gap); *United States v. Pritchett*, 40 F. App'x 901, 905-06 (6th Cir. 2002) (same, with an over 4-month gap); *United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. 2015) (same, with an 8-month gap). The Affidavit established a fair probability that firearms would be found at 2210 New Cut. *Spikes*, 158 F.3d at 923.[9]

Regardless, as the Government argues, law enforcement, with Judge Ingram's authorization, could search for firearms as evidence of or contraband associated with drug trafficking even absent the May gun sightings. *E.g.*, *United States v. Combs*, 369 F.3d 925, 937 (6th Cir. 2004) (upholding a warrant that "permitted a search to find the guns . . . plus any other evidence of illegal drug activity"); *United States v. Case*, 503 F. App'x 463, 466 (6th Cir. 2012) (Firearms seized pursuant to a warrant "f[e]ll within the scope of 'marijuana, morphine, other drugs, and paraphernalia' as listed on the search warrant." (internal alteration removed)); *United States v. Kia*, 170 F. App'x 457, 461 (9th Cir. 2006) (upholding a warrant authorizing a search

---

[9] Though the CW is the lone voice for the firearm reports, his or her narration benefits from the significant cross-corroboration evident throughout the Affidavit. Thus, the CW's reports of trafficking rest on a host of recorded and reliably witnessed transactions. As to the guns, he or she gave intimate detail of the home and of the firearms involved. The Affiant did not comment on the CW's reliability, but the Affidavit itself is replete with corroborating instances that contribute to a substantial basis as to the CW's overall trustworthiness as an information source here. Because he or she proved accurate on the drug side, Judge Ingram justifiably credited him or her on the firearm side.

for firearms in a drug case because "firearms are known tools of the trade of narcotics dealing because of the dangers inherent in that line of work" (internal quotation marks and alteration removed)); *United States v. Thomas*, 242 F.3d 1028, 1032 n.5 (11th Cir. 2001) (citing cases); *Hardin*, 248 F.3d at 499 ("This Court has held many times that guns are 'tools of the trade' in drug transactions. *United States v. Arnott*, 704 F.2d 322, 326 (6th Cir. 1983); *see also United States v. Medina*, 992 F.2d 573, 587 (6th Cir. 1993) (stating that evidence of firearms tended to prove the existence of a drug conspiracy); *United States v. Hatfield*, 815 F.2d 1068 (6th Cir. 1987) (stating that weapons are evidence of an intent to distribute drugs)."); *United States v. Davis*, 900 F.2d 260, at *1 (6th Cir. 1990) (table) ("[I]t is well settled that firearms may be seized pursuant to a search warrant directed at narcotics. Firearms are evidence of drug trafficking."); *Six v. Beegle*, No. 2:11-CV-698, 2013 WL 5707245, at *7 (S.D. Ohio Oct. 18, 2013) ("[T]he Sixth Circuit has recognized that firearms are evidence of drug trafficking." (citing *Hardin*)).

There is no doubt that evidence of Crowe's oxycodone distribution was not stale— indeed, her actions persisted over a lengthy period, documented in the Affidavit, until approximately a week before warrant execution. Thus, with the prior observation of firearms in her bedroom near several hundred pills while T / Coleman, her supplier, was present, and based on the principles in the above-cited cases, Judge Ingram clearly had a substantial basis to include firearms within the drug-charge-based search scope. This is an independent basis, separate from the firearm-charge-related staleness inquiry, to find the search for and seizure of firearm(s) proper here.

For these reasons, Crowe's staleness argument fails.

## IV.    PROBABLE CAUSE SUPPORTED THE SEARCH WARRANT.

Defendant raises other particular objections to warrant sufficiency. Each of Defendant's objections questions, through alternate means, probable cause. Clearly, probable cause here existed, dooming the motion.

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. CONST., amend. IV. Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Jackson*, 470 F.3d at 306 (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). To determine probable cause, an issuing judge must examine the totality of the circumstances and find "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (internal quotation marks omitted). A supporting affidavit must sufficiently demonstrate the existence of a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).

When evaluating whether a warrant application presented probable cause, a reviewing court must accord "great deference" to the issuing judge's determination. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). Such deference ensures than "an issuing [judge's] discretion [will] only be reversed if it was arbitrarily exercised." *See United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000). The reviewing court must uphold the issuing judge's probable cause determination if a "substantial basis" existed for the judge to conclude "that a search would uncover evidence of wrongdoing." *Illinois v. Gates*, 103 S. Ct. 2317, 2331 (1983); *Allen*, 211 F.3d at 973.

Additionally, line-by-line scrutiny of the supporting affidavit is inappropriate, *Jackson*, 470 F.3d at 306 (citing *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)), and the reviewing court must limit its analysis to the "information presented in the four corners of the affidavit." *Id.*; *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). When the search at issue occurred pursuant to a warrant, the defendant has the burden of establishing a prima facie case that the search was illegal. *United States v. Murrie*, 534 F.2d 695, 697-98 (6th Cir. 1976); *see also United States v. Franklin*, 284 F. App'x 266, 275 (6th Cir. 2008) (Clay, J., dissenting). The Court examines the affidavit at issue through a prism of common sense. *Gates*, 103 S. Ct. at 2331, 2333.

Here, probable cause undoubtedly supported warrant issuance. The affiant, SA Maynard, set forth numerous interwoven details of law enforcement's investigation into the oxycodone distribution operation in which Defendant allegedly participated. Maynard directly tied Crowe to oxycodone distribution through, at a minimum, the following:

1.   The numerous oxycodone (and one heroin) transactions at 214 Main Street, where Crowe (at least at one time) apparently lived in May. Recorded transactions occurred at 214 Main Street at least, apart from the ones detailed below, on May 7 and 13, 2015.

2.   On May 15, 2015, the CW and Holder exchanged money for oxycodone in the Dairy Queen parking lot, through the passenger window of Crowe's white Mercedes, *while agents observed Crowe in the driver's seat*.

3.   On June 2, 2015, the CW and UC bought oxycodone from Holder at 214 Main Street while Crowe was in the bathroom with dealer Cundiff. Holder remarked

that a significant portion of the exchanged money belonged to Lisa. Crowe's Mercedes was outside the residence, and agents observed her leave after the transaction was complete.

4.    On June 9, 2015, the CW and UC bought oxycodone from Holder at a Marathon Gas Station. Holder advised, using telling pronouns, that Crowe sells him and resupplies him with oxycodone. Holder advised that the UC could sit down with "her" and talk business.

5.    On June 9, 2015, the CW advised that he was with Crowe, Holder, T, and Black at 214 Main Street. The next day, Holder told the CW that Crowe went to Detroit to pick up thousands of oxycodone pills. Maynard knew of and expressed incriminating information about T and his criminal past. The CW's information about T, Georgia based pills, and the supply connection was corroborative.

6.    On June 12, 2015, Crowe **directly sold** the UC 20 doses of oxycodone at the Dairy Queen.

7.    On June 16, 2015, Crowe **directly sold** the UC 100 doses of oxycodone at the Downtown Athletic Center.

A "known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility[.]" *United States v. Kinison*, 710 F.3d 678, 682-83 (6th Cir. 2013). Thus, given the extensive corroboration here, Crowe's complaint that the affidavit did not state that agents found the CW reliable does not call into question the overall probable cause finding.[10] Here, Maynard knew the CW's identity, and

---

[10] The cases Crowe cites—*United States v. Hammond*, 351 F.3d 765 (6th Cir. 2003) and *Jackson*, 470 F.3d 299—are readily distinguishable or actually support warrant propriety here. *Hammond*

law enforcement, through its own investigation, and through listening to and watching the recordings, substantiated the CW. Further, the UC was present during many of the transactions and corroborated the detail, and Crowe raises no objection to his/her credibility. As stated above, the warrant did not rise or fall on the CW's unsupported word.

The Court notes Crowe's argument concerning "the manifest unreliability of Holder," DE #46-1, at 3-4, but, as stated above, the Court sees nothing Holder-dependent in the Affidavit crucial to probable cause. Many of the perceived credibility problems that Crowe asserts arise only with Holder's post-arrest statements. Indeed, the recordings and law enforcement's own observation and investigation independently document the oxycodone deals involving Holder and / or Crowe, as well as many details provided by Holder.

Crowe also particularly challenges the nexus between oxycodone (or other contraband) and the residence at 2210 New Cut. "To establish probable cause necessary for every search warrant, the supporting affidavit must set forth a nexus between the place to be searched and the evidence sought. . . . The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Penney*, 576 F.3d 297, 311 (6th Cir. 2009) (internal quotation marks, alteration, and citations removed).

---

involved a single informant tip that, unlike the CW's many instances of providing corroborated information, was "entirely unsupported by any independent investigation on the part of the police." 351 F.3d at 772. In *Jackson*, the Circuit affirmed the probable cause finding *despite* a lack of detail on the informant's reliability because police had corroborated the informant's statements. 470 F.3d at 307-08. So too here, where the UC role and recorded deals built a solid and objective case independent of the CW's reports. "[T]he magistrate's finding of probable cause . . . was based on the affiant's personal knowledge and observations, rather than hearsay of the informant." *Id.* at 308.

The argument, on this record, fails. The following factors, at a minimum, establish a sufficient nexus between Crowe's oxycodone involvement, the fair expectation of evidence, and 2210 New Cut Road:

1.    On May 22, 2015, Crowe initiated electric service in her own name at 2210 New Cut Road, using the same telephone number as Crowe provided to the UC. This was *after* the May 15 direct buy (with Crowe in the driver's seat) and well *before* the June 12 and 16 direct buys from Crowe. Thus, the affiant presented evidence of Crowe distributing oxycodone before and after turning on electricity at New Cut in her own name.

2.    On June 2, 2015, directly following an oxycodone deal at 214 Main Street, agents observed Crowe leave the residence, get in her white Mercedes, and drive to 2210 New Cut Road.

3.    On June 9, 2015, agents followed Coleman's (aka T, Crowe's supplier) truck to 2210 New Cut Road. Later, Crowe's Mercedes headed in the same vicinity, and later agents observed a white vehicle parked at that residence.

4.    Also on June 9, 2015, Crowe told the CW, in the presence of Holder, T, and Black, that "they were moving residences."

5.    On June 12, 2015, at the time of a direct buy from Crowe, Crowe said it would take her 45 minutes to go "to the house" to get sufficient oxycodone. Maynard, in his training and experience, knew that 45 minutes is the approximate time it would take to go round trip from the Dairy Queen to 2210 New Cut Road, not 214 Main Street. Thus, Maynard believed that Crowe referred to 2210 New Cut Road

as her "house." Again, the focus here is on whether there was probable cause, not definitive cause. Crowe likely had to go one of two places, either the Main Street or New Cut Road locations. Maynard quite rationally believed, based on the full context, that she meant New Cut Road. Judge Ingram had an unimpeachable substantial basis on which to credit this belief. Based on the full record, Crowe likely meant the New Cut Road residence at the time.

6.      At 5:00 a.m. on June 17, 2015, Charles and Daniels observed Crowe's Mercedes parked at 2210 New Cut Road. This is the early morning the day after (so, in effect, mere hours after) a direct purchase of 100 doses of oxycodone by the UC from Crowe. In a common-sense evaluation of the circumstances, the observation suggests that Crowe spent the night at 2210 New Cut, substantially indicating that site as her current residence.

Clearly, on this record, Judge Ingram had a substantial basis to believe that 2210 New Cut Road was Crowe's residence. Judge Ingram knew, via Maynard's representations, the electricity at New Cut was in Crowe's name (and that the phone number on file was the same she gave to the UC), that Crowe directly participated in oxycodone distribution before and after turning on the electricity, that Crowe went to New Cut directly following a drug deal on June 2, that T / Coleman (Crowe's supplier) knew of and had physically been present at New Cut, that Crowe advised on June 9 that "they were moving residences," and that Crowe's Mercedes was at New Cut at 5:00 a.m. (reasonably indicating she had slept at the residence) only hours after she sold the UC 100 doses of oxycodone. These factors amount to a reasonable basis to believe that

Crowe then lived at 2210 New Cut. The last noted sighting of Crowe at 214 Main was on June 9, when she represented a planned residence change.

The Court considered Defendant's argument about "contradictory information regarding where the affiant believe[d] defendant is residing," DE #46-1, at 2, but none of the included bullet points, *id.* at 2-3, strikes the Court as contradictory or unusual. The information in the Affidavit shows an individual in the process of moving residences, shuffling between the two, and, in the interim, continuing to traffic drugs out of 214 Main. Again, after Crowe stated that she was moving, the Affidavit details no further 214 Main sighting of her. Based on the facts above, there was clearly a reasonable basis on which Maynard and Judge Ingram could believe that 2210 New Cut was Crowe's residence.

"[A]n issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." *Penney*, 576 F.3d at 311; *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (citing cases). Here, the Affidavit relates continuing oxycodone trafficking activity by Crowe, from which Judge Ingram could infer that evidence of oxycodone trafficking would be found at Crowe's residence. *Williams*, 544 F.3d at 687; *see also id.* at 686-87 ("While Williams correctly asserts that the warrant affidavit never tied the . . . handguns to the Tarnow Street residence, he overlooks the Government's logical, and indeed legally correct, assertion that it is reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there." (internal quotation marks removed)). Indeed, Crowe concedes that there are "some grounds to conclude that there existed a connection between Crowe and the New Cut Road location[.]" DE #46-1, at

6-7. Strong indications that Crowe dealt from and involving her residence existed, including deals at the Main Street home and a trip "to the house" to fetch oxycodone.

*United States v. Goward*, 188 F. App'x 355 (6th Cir. 2006), cited in the Affidavit and by the United States, is on point. The Sixth Circuit phrased and answered the question presented: "The question before this court is whether an affidavit containing credible, verified allegations of drug trafficking, verification that said defendant lives at a particular residence, combined with the affiant-officer's experience that drug dealers keep evidence of dealing at their residence, when there is absolutely no indication of any wrongdoing occurring at that residence, establishes probable cause for the issuance of a warrant to search that residence. We are inclined to answer in the affirmative[.]" *Id.* at 358; *see also id.* at 358-59 (citing cases). Particularly, "Goward was involved in a marijuana smuggling operation along with Contreras, this operation was witnessed by an undercover officer who was sold the marijuana, and there was sufficient and independent proof that Goward lived at 2225 Birch Run Road." *Id.* at 359. So too here—Crowe was involved in an oxycodone distribution operation, witnessed by a CW and UC who repeatedly purchased drugs, and there was sufficient and independent proof that Crowe lived at 2210 New Cut.

In circumstances where, as here, police "independently corroborated [the] fact that the defendants were known drug dealers at the time the police sought to search their homes[,]" a sufficient nexus may exist. *United States v. McPhearson*, 469 F.3d 518, 524, 524 n.3 (6th Cir. 2006) (finding an insufficient nexus where any "allegation of drug dealing was absent from the affidavit supporting the warrant"). This is not a case where Judge Ingram, for instance, "infer[red] that evidence of wrongdoing would be found in [Crowe]'s home because drugs were found on h[er] person." *Id.* at 525. "[D]rug trafficking, which the affiant witnessed and is further

23

substantiated from his experience and training, establishes a sufficient nexus to support a finding of probable cause to search the place where the drug trafficker *presently lives*." *Goward*, 188 F. App'x at 359-60 (emphasis added); *see also United States v. Jones*, 159 F.3d 969, 974-75 (6th Cir. 1998). Such is the case here. Thus, because there was a reasonable basis to believe that Crowe lived at 2210 New Cut and that Crowe currently trafficked oxycodone, and because a court can reasonably, in these circumstances, infer that a trafficker keeps evidence of the crime in the residence, *Penney*, 576 F.3d at 311, Judge Ingram reasonably authorized a search of 2210 New Cut Road consistent with Maynard's experience-based opinion.

In sum, law enforcement conducted a thorough investigation. Officers began probing an oxycodone ring through a CW and UC, who identified Crowe as a key oxycodone trafficking player. The UC, the officers' own investigation, and Maynard's review of all recordings directly corroborated the CW's connectivity and knowledge. Plainly, the totality of the evidence, viewed in a common-sense manner, supports warrant validity. There was a sufficient nexus between drug activity and 2210 New Cut via Crowe's continued trafficking and the plain evidence of a residence change. The facts, viewed as a whole, confirm Judge Ingram's quite reasonable belief—far more than a mere suspicion—that Crowe distributed oxycodone and that evidence of such would be found at 2210 New Cut Road and/or in the white Mercedes. Maynard presented plenteous facts, gathered over weeks of police investigation and work with a cooperator and undercover officer, that supported warrant issuance. Judge Ingram had a substantial basis on which to issue the warrant based on the totality of the evidence presented in the Affidavit, and the warrant legitimately encompassed the particularized list of categories Judge Ingram crafted, including firearms.

## V.        CONCLUSION

Defendant has not justified a *Franks* hearing, the Affidavit's information was not stale, and probable cause supported the search warrant in all respects.[11] Accordingly, the Court **RECOMMENDS** that the District Court **DENY** Defendant's motion to suppress (DE #46).

\*   \*   \*   \*   \*

The Court issues this recommendation under 28 U.S.C. § 636(b)(1)(B). The parties should consult 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b) for specific appeal rights and mechanics. To maintain the schedule, the Court hereby **shortens** the objection period: the parties must file any objection by **no later than March 14, 2016**. Failure to object in accordance with the Rule waives a party's right to review.

This the 4th day of March, 2016.



Signed By:

*Robert E. Wier*

**United States Magistrate Judge**

---

[11] Because the Court so concludes, it need not exhaustively analyze the application of the good faith exception or the propriety of suppression as a remedy. *See United States v. Godfrey*, 427 F. App'x 409, 412-13 (6th Cir. 2011); *United States v. Master*, 614 F.3d 236, 241-43 (6th Cir. 2010). Still, the Court notes certain things. First, Crowe in no way describes the circumstances of any statement or other search she claims would be fruit of an illegal search. This would prevent a complete analysis, even if warranted. More importantly, the Court perceives utterly no argument for suppression under developed good faith exception standards in this Circuit. *See, e.g.*, *United States v. Brummett*, No. 5:13-135-DCR, 2014 WL 2118265, at \*6-\*8 (E.D. Ky. May 21, 2014) (explaining the standard, including the balancing test required). In sum, the Court sees no police misconduct or disregard for the Fourth Amendment to deter through the costly act of suppression.